IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO


CITIZENS PROGRESSIVE ALLIANCE
and STEVE CONE

        Plaintiffs,

vs.                                  No. CIV 01-1044 LCS/DJS

UNITED STATES BUREAU OF INDIAN
AFFAIRS, et al.

        Defendants.


## MEMORANDUM OPINION AND ORDER

THIS MATTER is before the Court upon the parties' cross-motions for summary judgment. The Plaintiffs Steve Cone and Citizens' Progressive Alliance have each filed for summary judgment against Defendants Bureau of Indian Affairs and Department of Interior. Defendants have filed for summary judgment against Plaintiffs Steve Cone and Citizens' Progressive Alliance. Intervenors Southern Ute Indian Tribe and Ute Mountain Tribe have filed for summary judgment against Plaintiff Steve Cone.[1] The parties have filed, in addition to their various cross-motions, memoranda, exhibits, and declarations in support of their positions, as well

---

[1]    This Order is upon Defendants' Motion for Summary Judgment filed June 24, 2002 (*Doc. 37*; Intervenor Southern Ute Indian Tribe's Motion for Summary Judgment filed June 24, 2002 *(Doc. 39)*; Plaintiff Steve Cone's Motion for Summary Judgment filed June 24, 2002 *(Doc. 41)*; Plaintiff Citizens' Progressive Alliance's Motion for Summary Judgment filed June 24, 2002 *(Doc. 42)*; Intervenor Ute Mountain Tribe's Motion for Summary Judgment filed June 25, 2002 *(Doc. 45)*; and Defendant's Motion for Summary Judgment filed July 24, 2002 *(Doc. 53)*.

as various responses and replies.  Defendants filed a Vaughn Index[2] on April 12, 2002 *(Doc. 30)*. Pursuant to the Order Requiring *In Camera* Review filed October 16, 2002 *(Doc. 74)*, Defendants submitted the documents at issue for *in camera* review by the Court[3]. This Court has jurisdiction over this matter pursuant to U.S.C. § 552 (a)(4)(B)[4].  The parties have each consented to having the United States Magistrate Judge to conduct all further proceedings in this case pursuant to 28 U.S.C. § 636 (c). This Court, having considered the motions, the responses, the replies, the memoranda, the exhibits, and other supporting material, the applicable law, and the interests of justice, and having examined the documents at issue *in camera*, finds that the summary judgment motions of Defendants BIA and DOI and Intervenors Southern Ute Indian Tribe and Ute Mountain Tribe against Plaintiff Steve Cone should be **GRANTED;** in addition, Defendants' Motion for Summary Judgment against Plaintiff CPA should be **GRANTED**; the motions for summary judgment of Plaintiffs Steve Cone and Citizens' Progressive Alliance as to Defendants BIA and DOI should be **DENIED.**

---

[2]      Pursuant to *Vaughn v. Rosen*, 523 F.2d 1136 (D.C. Cir. 1975).

[3]      As noted below, 5 U.S.C. § 552 (a)(4)(b) specifically provides that the Court "may examine the contents of such agency records in camera to determine whether such records or any part thereof shall be withheld. . . ."

[4]      Section 552 (a)(4)(B) provides, in pertinent part, that "[o]n complaint, the district court of the United States in the district in which the complainant resides, or has his principal place of business . . .  has jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant. In such a case the court shall determine the matter de novo, and may examine the contents of such agency records in camera to determine whether such records or any part thereof shall be withheld under any of the exemptions set forth in subsection (b) of this section, and the burden is on the agency to sustain its action."  5 U.S.C. § 552 (a)(4)(b).

# I.   FACTUAL BACKGROUND

Plaintiff Steve Cone, a resident of San Juan County, New Mexico, is the Animas-La Plata Project Coordinator for Plaintiff Citizens' Progressive Alliance, a Colorado non-profit organization with offices in both Colorado and New Mexico.  Compl. ¶6-7.  Cone has expressed opposition to the Animas-La Plata project at public meetings.  Answer ¶6.  Cone is affiliated with a website located at http:/www.angelfire.com/al/alpcentral.  Answer ¶6.

The United States Bureau of Indian Affairs (hereinafter, "BIA") is an agency of the Department of Interior (hereinafter, "DOI").  Answer ¶8.  Defendant BIA is responsible for the Freedom of Information Act[5] ("FOIA") requests of Plaintiffs which are the subject of this action. Answer ¶8.  The DOI makes determinations of FOIA administrative appeals, and made such determinations regarding administrative appeals related to Plaintiffs' FOIA requests.  Answer ¶9.

The United States and Intervenors Ute Mountain Ute Tribe and the Southern Ute Indian Tribe (hereinafter, "the Tribes") are co-parties in *In the Matter of the Application for Water Rights of the United States of America (Bureau of Indian Affairs, Southern Ute and Ute Mountain Ute Tribes) for Claims in Water Division No. 7, San Juan River Drainage Colorado*, Case Nos. W-1603-76 (hereinafter, "Colorado No. 7 adjudication").  Second Declaration of John Cawley (hereinafter, "Second Cawley Decl.") ¶4. The Colorado No. 7 adjudication was settled with some contingencies by a 1988 federal Settlement Act and a 1991 Decree; however, because some contingencies were not satisfied, a revised settlement with new contingencies was enacted in 2001.  *Id*.  If the contingencies are not fulfilled, full-scale litigation of the Tribes' water rights may ensue in the Colorado No. 7 adjudication regarding the Tribes' claims for Animas and La Plata

---

[5] *See generally*, 5 U.S.C. § 552.

River water.  *Id*.

**A.      Plaintiff Steve Cone's FOIA Request**

Plaintiffs Citizens' Progressive Alliance (hereafter "CPA) and Steve Cone filed a

Complaint for Declaratory and Injunctive Relieve on September 10, 2001 *(Doc. 1)*.  Compl. ¶¶6-

7.  Plaintiffs CPA and Cone seek a declaratory judgment that Defendants BIA and DOI violated

the Freedom of Information Act, 5 U.S.C. § 522, "by failing to provide all non-exempt portions of

agency records sought in two separate FOIA requests submitted by Plaintiffs" to the Albuquerque

Area Office of the BIA on July 26, 1999 and August 10, 1999.  Compl. ¶1.  Plaintiffs further seek

an order compelling Defendants "to immediately provide all non-exempt records and all non-

exempt portions of the agency records sought in Plaintiffs' FOIA requests."  *Id*.  Plaintiff CPA

seeks an Order compelling Defendant BIA to grant a fee waiver made in conjunction with a FOIA

request.  Plaintiffs seeks additional declaratory and injunctive relief, as well as attorneys fees and

costs.

Plaintiff Cone's July 26, 1999 FOIA request to Defendant BIA sought a preliminary

assessment of the Southern Ute Tribe's water rights claims prepared for the BIA by Keller-

Bliesner Engineering (hereafter, "Keller-Bliesner Report") as well as "all documents including

memos, letters, reports, approval memoranda, agency policy, [and] agency evaluations" related to

the Keller-Bliesner Report.  Compl. ¶10; Answer ¶10; Cone Memo. Ex. A.  This FOIA request

also included a request for a waiver of fees, as well as information intended to demonstrate

eligibility for a fee waiver.  *Id*.

The BIA sent Cone an initial response to the July 26, 1999 FOIA request, stating that

Cone's request was "broad and non-specific" and requested clarification as to the scope of Cone's

4

FOIA request.  Compl. ¶11; Answer ¶11.  This same response further indicated that the information provided by Cone in support of his fee waiver request was insufficient.  Compl. ¶11; Answer ¶11 By letter, Cone replied to BIA's initial response, indicating that the scope of his FOIA request included the "Keller-Bliesner Report and all BIA records associated with the Report."  Compl. ¶12.

On September 17, 1999, BIA issued a letter denying Plaintiff Cone's FOIA request for the Keller-Bliesner Report, stating that "the information you have requested, the 1985 Keller-Bliesner Report quantifying water rights for the Southern Ute Tribe and all associated office memoranda discussing or adopting the report, was specifically developed in preparation for litigation and litigation is still a consideration for resolving outstanding issues."  Compl. ¶13.  The BIA claimed that the requested information was protected from disclosure under Exemption 5 of FOIA, 5 U.S.C. § 552(b)(5)[6].  Id.  The BIA further indicated in its letter that the agency was searching its records and would create a list of records associated with the Keller-Bliesner Report which were also being withheld.[7]  Id.  The letter stated that "[t]his list will be released to you . . . as soon as completed, but in any case no later than 14 days from today's date."  Cone Memo. Ex. B.

Thereafter, the BIA notified Cone by letter that it would not release the list of other agency records associated with the Keller-Bliesner Report, again claiming protection from disclosure under Exemption 5.  Compl. ¶14.  Cone appealed the denial of his FOIA request and

_____

[6]      Section (b)(5) provides, in pertinent part that:  "This section [FOIA ] does not apply to matters that are . . . . inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency."  *See* 5 U.S.C. § 552(b)(5).

[7]      The September 17, 1999 also letter informed Plaintiff Cone is his right to appeal. Cone Memo. Ex. B.

the denial of his fee waiver request to the FOIA Appeals Officer of the DOI.  Compl. ¶15.   The

DOI upheld the denial of Cone's fee waiver request, and remanded the appeal to the Albuquerque

Area Office of the BIA to determine whether the requested records would be released and what

the cost of processing would be.  Compl. ¶16.

Upon remand, the BIA released various records associated with the Keller-Bliesner

Report, and indicated that the agency was still reviewing additional records for possible release

pursuant to Cone's FOIA request.  Compl. ¶17.  The BIA later issued a final response to the

remanded portion of Plaintiff Cone's FOIA request.  Compl. ¶18.  The final response described

BIA records, including documents which BIA determined were non-responsive to Cone's FOIA

request, documents were which responsive and which would be released, and other responsive

documents which BIA claimed were exempt from release under Exemption 5.  *Id*.

Cone appealed the BIA's final response to the remanded portion of Cone's FOIA request

to the FOIA Appeals Officer.[8]  Compl. ¶19.  The FOIA Appeals Officer granted in part and

denied in part Cone's appeal, releasing additional documents, and denying disclosure pursuant to

FOIA Exemption 5 as to certain records or portions of records associated with the Keller-Bliesner

Report.  Compl. ¶20. The decision issued by the FOIA Appeals Officer included a

recommendation that the DOI deny Cone's FOIA request "on the basis of the deliberative process

(DP), attorney work-product (AWP), and government commercial information (GCI) privileges

of Exemption 5 of the FOIA."  Cone Memo. Ex. E.   The FOIA Appeals Officer also

recommended that Cone's fee waiver request be denied.  *Id*.  These recommendations were

---

[8]        Although Cone's initial FOIA request and letter of clarification were apparently
made *pro se*, Cone was represented by counsel in making his appeal to the FOIA Appeals Office
of the DOI.  Cone Memo. Ex. D.

adopted by the DOI. *Id*. Cone thereafter brought suit in the instant action, pursuant to 5 U.S.C. § 552 (a)(4)(B), seeking declaratory and injunctive relief and a grant of costs and attorneys fees pursuant to 5 U.S.C. § 552(a)(4)(E).

**B.     Plaintiff CPA's FOIA Request**

CPA submitted a FOIA request to the Albuquerque Area Office of the BIA on August 10, 1999. Compl. ¶ 21.   The request sought various categories of BIA records pertaining to the BIA's involvement in water deliveries associated with the Pine River Project, and further sought BIA records pertaining to any land classification studies performed on the Southern Ute and Ute Mountain reservations. *Id*.   CPA's FOIA request specifically sought the Keller-Bliesner Report. *Id*.   In its FOIA request, CPA asked for various documents as well as "some explanation" of the differences in rates under individual water carriage contacts. CPA Memo. Ex. A.   CPA's FOIA request asked for organization of any information provided ("[a] delineation by Ute and non-Ute contractors is also requested"; "[a] complete breakdown of how Ute tribal water developed"; "a breakdown of how the Indian direct-flow rights from the Pine River. . . are being used by tribal allottees"; "an accounting of any and all revenues accruing to the agency." ) *Id*.   CPA also requested  a fee waiver.  Compl. ¶ 21; CPA Memo. Ex. A.

By letter on September 17, 1999, the BIA sent CPA a letter asking for clarification of CPA's FOIA request.   Compl. ¶22.  The response letter stated that federal agencies are not "under a duty to create new records to satisfy a request, or create new records explaining documents released pursuant to a FOIA request.  Much of the information [CPA] requested falls into that category. . . . Without clarification as to whether [CPA] is seeking only currently generated documents which could be responsive to [CPA's] request, we are unable to review and

consider your request at this time."  CPA Memo. Ex. B.   The letter indicated that the Keller-Bliesner Report and associated office memoranda were developed in preparation for litigation, and stated that these documents were exempt from disclosure under Exemption 5 of FOIA.  *Id*. The letter also indicated that CPA's fee waiver request would not be reviewed until CPA provided further clarification of its FOIA request.  *Id*.

CPA appealed the September 17, 1999 letter from the BIA which asked for clarification of CPA's FOIA request and indicated that a determination on the fee waiver request would not be made until the FOIA request was clarified.  Compl. ¶ 23.  The BIA FOIA Appeals Officer issued a decision on March 14, 2000, affirming the BIA decision to withhold the Keller-Bliesner Report and associated documents.  Compl. ¶24.  The decision of the FOIA Appeals Officer treated the BIA's decision to defer consideration of the fee waiver request as a denial of the fee waiver, and affirmed the denial of the fee waiver request.  *Id*.

Plaintiff CPA thereafter brought the instant action, seeking declaratory and injunctive relief, and seeking costs and attorneys fees pursuant to 5 U.S.C. §§ 552(a)(4)(B) and (a)(4)(E).

## C.    The Documents Sought

Four documents requested by Cone are specifically at issue:  (a) Memorandum from Frank Jones, Bureau of Indian Affairs, to Files re: "Meeting to Review Status of the Water Adjudication Suits in Division No. 7 of Colorado", dated March 5, 1981 (hereinafter "Jones Memorandum"); (b) Letter from Barry W. Welch, Assistant Area Director, BIA, to John P. Lange, U.S. Department of Justice, dated May 21, 1984 (hereinafter "Welch letter"); (c) letter from Ron D. Bliesner, Vice President, Keller Bliesner  Engineering, to Frank Jones, Bureau of Indian Affairs, dated April 26, 1984 (hereinafter "Bliesner letter"); and (d) Preliminary Assessment:  Reserved

Irrigation Water Rights Claims, Southern Ute Reservation, dated May 25, 1985, (Keller-Bliesner

Report).  Brief St. of Case at 3-4. *See* Vaughn Index at 1-2, 4, 6, 9.

      **1.**      **Jones Memorandum**.

      The Jones memorandum is a two-page memo from Frank Jones, Bureau of Indian Affairs,

to file.  Vaughn Index at 2; Second Cawley Dec. ¶ 4.  Frank Jones was the lead supervisor for

BIA on matters relating to tribal water rights until 1986.  Second Cawley Dec. ¶ 4.  The Jones

memorandum is described in the Vaughn Index as "summariz[ing] a meeting held in the

Albuquerque Area Office of the BIA regarding the litigation of federal Indian water rights claims

of the Southern Ute and Ute Mountain Ute Reservations in the State of Colorado's Water

Division No. 7 adjudication".  Vaughn Index at 2.   The introduction, list of participants, and

signature block of the Jones memorandum were released to Plaintiff Cone.  Second Cawley Decl.

¶13.  The withheld portion is described as "largely relat[ing] ideas and suggestions made by the

litigation team - including attorneys - during the meeting."  Vaughn Index at 2.  The memorandum

describes "discussions including opinions regarding the current status of on-going studies,

recommendations about what other studies would be helpful to the case, suggestions for next

steps in the litigation process, and predictions about how the case may proceed.  It does not

record any final litigation decisions."  Second Cawley Decl. ¶13.  All of the participants in the

meeting "worked directly or as consultants for the Departments of Interior or Justice."  Vaughn

Index at 2; Second Cawley Decl. ¶13.  The participants in the meeting are described as BIA

employees, BIA consultants, a Department of Justice lawyer, and a lawyer from the Department

of Interior Solicitor's office.  Southern Ute Memo at 4; Southern Ute Ex. 1; Vaughn Index at 2.

There is no indication that the Jones Memorandum was shared with anyone else.  Southern Ute

Memo at 4; First Declaration of John Cawley ("First Cawley Decl.") at ¶6-7.

### 2.      Welch Letter

The Welch letter is a three-page letter from Barry W. Welch, Assistant Area Director, Bureau of Indian Affairs, to John P. Lange, U.S. Department of Justice, the lead attorney for the Department of Justice for the litigation and negotiation of tribal water rights. First Cawley Decl. ¶4..  The Welch letter is described as "outlin[ing] some of the possible choices and their probable results" for "making reserved right claims to the Dolores, Animas, and Las Plata Rivers."  Vaughn Index at 4.  The Welch letter further "suggests that decisionmakers 'should attempt . . . to decide upon a single course of action for each of these three basins' and offers some 'practical and technical considerations,' including 'some legal and political items to consider."  *Id*.  This letter is further described as "recast[ing] and expand[ing] upon the information provided in the attached letter from Ron D. Bliesner, Vice President, Keller-Bliesner Engineering to Frank Jones, Bureau of Indian Affairs" (Bliesner letter).  *Id*.  The Welch letter was shared under separate cover by the U.S. Department of Justice with the Southern Ute tribe's attorney.  *Id*. at 6. The Welch letter was withheld in its entirety from disclosure to Plaintiff Cone by the BIA.  Second Cawley Decl. ¶14.

### 3.      Bliesner Letter

The Bliesner letter, a two-page letter from Ron D. Bliesner, Vice President, Keller-Bliesner Engineering to Frank Jones, Bureau of Indian Affairs, was attached to the Welch letter. Vaughn Index at 6.  The Bliesner letter discusses "a range of options on dealing with the claims from the Animas, La Plata, and Dolores Rivers for the Southern Ute and Ute Mountain Ute Tribes."  *Id*.  The letter includes a description of each option, the justification for each option, and "an analysis of the relative merits of each."  *Id*.  The letter states that "[w]e need to review these

10

possibilities and weigh the options". Second Cawley Decl. ¶15.  The Bliesner letter was shared

under separate cover by the U.S. Department of Justice with the Southern Ute tribe's attorney.

Vaughn Index at 8.  The Bliesner letter was withheld in its entirety from disclosure by the BIA.

Second Cawley Decl. ¶15.

### 4.        Keller-Bliesner Report

The final document which Plaintiffs seek to obtain is the Keller-Bliesner Report of May

25, 1985, which was prepared by Keller-Bliesner Engineering for Defendant BIA.  Vaughn Index

at 9.  Keller-Bliesner Engineering was hired to provide the BIA with expert services in matters

such as agricultural engineering and irrigation design in order to prepare the United States for

litigating and negotiating the Tribes' water rights.  Second Cawley Decl. ¶17.  The Keller-Bliesner

Report "consists of 17 pages of text, together with a title page and table of contents." *Id*.  The

introduction of the Keller-Bliesner Report was released to Cone and indicates that the report was

"prepared at the request of the Albuquerque Area Office of the Bureau of Indian Affairs to

provide a preliminary description of the potential areas for irrigation project development with the

associated potential claims for each area on the Southern Ute Reservation . . . . The information

herein is intended for use by the BIA and the Tribe in preparing a negotiating position for water

rights."  Vaughn Index at 9.  The Keller-Bliesner Report was shared under separate cover by the

U.S. Department of Justice with the Southern Ute tribe's attorney.  *Id*. at 12.  The cover letter

sharing the Keller-Bliesner Report expressly stated that "[t]he assessment is preliminary and

confidential" and directed the Tribe's attorney to maintain confidentiality of the Report.  Second

Cawley Decl. ¶25.

## II.    STANDARD OF REVIEW

A motion for summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."*Jones v. Denver Post Corp.*, 203 F.3d  748, 751 (10th Cir. 2000); Fed. R. Civ. P. 56(c).  The Court examines the record and makes all inferences in the light most favorable to the non-moving party.  *Munoz v. St. Mary-Corwin Hosp.* 221 F.3d 1160, 1164 (10th Cir. 2000). Summary judgment is proper "[w]here the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party."  *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)(citing *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 289 (1968)).  The party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts"; the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial."  *Matsushita*, 475 U.S. at 586-87 (citing Fed. Rule Civ. P. 56(e)). In addition, where the non-moving party will bear the burden of proof at trial on a dispositive issue, "that party 'must go beyond the pleadings' and 'designate specific facts' so as to 'make a showing sufficient to establish the existence of an element essential to that party's case' in order to survive summary judgment."  *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1128 (10th Cir. 1998)(quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . .the nonmoving party must come forward with specific facts showing that there is a genuine issue for

trial. FED. RULE CIV. P. 56(e) *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

587 (1986)(internal citations omitted).  Where the record taken as a whole could not lead a

rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.

*Matsushita*, 475 U.S. at 587.  On summary judgment the inferences to be drawn from the

underlying facts must be viewed in the light most favorable to the party opposing the motion.  *Id*.

at 588 (internal citations omitted).

The standard of review of Defendant BIA's decision to withhold the four documents at

issue is *de novo*.  *See* 5 U.S.C. § 552(a)(4)(B).  Federal courts are granted the authority to enjoin

the agency from withholding records and to determine whether records fall within the statutory

exemptions listed in 5 U.S.C. § 552(b); § 552(a)(4)(B).  "In any FOIA action challenging an

agency decision to withhold records, the district court reviews *de novo* the agency's decision not

to disclose." *Herrick v. Garvey*, 298 F.3d 1184, 1189 (10th Cir. 2002).

### III.   ANALYSIS

The Freedom of Information Act,  enacted in 1966, provides the public with a right of

access to federal agency records. *Herrick*, 298 F.3d at 1189 (citing generally, 5 U.S.C. § 552).

Agencies are required to make all records accessible to the public upon request. *Herrick,* 298

F.3d at 1189; 5 U.S.C. § 552(a)(3).  Deadlines are set for the time within which the agency must

respond to record requests, and fees may be charged for reasonable copying and search costs.

*Herrick*, 298 F.3d at 1189; 5 U.S.C. §§ 552(a)(6)  and 552(a)(4)(A).

Upon request, FOIA mandates disclosure of records held by a federal agency, unless the

documents fall within certain enumerated exemptions. *See Department of Interior v. Klamath

Water Users Protective Assn.*, 532 U.S. 1, 7 (2001)(citing generally 5 U.S.C. § 552(b)).

However, these enumerated exemptions "do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act." *Klamath*, 532 U.S. at 8.  The public right of access to federal agency records created by FOIA is enforceable in court.  *Audubon Soc'y v. United States Forest Serv.*, 104 F.3d 1201, 1203 (10th Cir. 1997) (citing generally *Anderson v. Department of Health & Human Servs.*, 907 F.2d 936, 941 (10th Cir. 1990)).   FOIA is thus to be broadly construed in favor of disclosure. *Audubon*, 104 F.3d at 1203.  The federal agency resisting disclosure bears the burden of justifying nondisclosure. *Id*.

FOIA "does not require disclosure, however, of all government documents, but permits access 'only to information that sheds light upon the government's performance of its duties.'" *Audubon*, 104 F.3d at 1203 (citing *Sheet Metal Workers Int'l Ass'n, Local No. 9 v. United States Air Force*, 63 F.3d 994, 996 (10th Cir. 1995)).   Accordingly, FOIA contains nine specific exemptions from disclosure. "Consistent with the Act's goal of broad disclosure, these exemptions have been consistently given a narrow compass."  *Klamath*, 532 U.S. at 8 (citing *Department of Justice v. Tax Analysts*, 492 U.S. 136, 151 (1989)).  These exemptions must thus be narrowly construed.  *Klamath*, 532 U.S. at 8 (citing *FBI v. Abramson*, 456 U.S. 615, 630 (1982)); s*ee also, Audubon*, 104 F.3d at 1203.

**A.      Whether the Documents are Entitled to Protection Under 5 U.S.C. § 552(b)(5).**

Exemption 5 protects from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). To qualify, a document must thus satisfy two conditions: its source must be a Government agency, and it must fall within the ambit of a privilege against discovery under judicial standards that would govern litigation against the agency that holds it.  5

14

U.S.C. § 552(b)(5); s*ee also, Klamath*, 532 U.S. at 8.

> **1.     Whether the documents are "inter-agency or intra-agency memorandums or letters.**

The first condition of Exemption 5 is no less important than the second; the communication must be "inter-agency or intra-agency." *Klamath*, 532 U.S. at 9 (citing 5 U.S.C. § 552(b)(5)). In this context, "'agency' means 'each authority of the Government of the United States,' and 'includes any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government . . ., or any independent regulatory agency.'" *Klamath*, 532 U.S. at 9 (quoting 5 U.S.C. §§ 551(1) and 552(f)).

The Supreme Court in *Klamath* noted that "some Courts of Appeals have held that in some circumstances a document prepared outside the Government may nevertheless qualify as an 'intra-agency' memorandum under Exemption 5." *Klamath*, 532 U.S. at 9 (citing *Hoover v. Dept. of Interior*, 611 F.2d 1132, 1137-38 (5th Cir. 1980)(additional internal citations omitted)). The Court pointed to Justice Scalia's dissenting opinion in *United States Dept. of Justice v. Julian*, noting:

> It is textually possible and . . . in accord with the purpose of the provision, to regard as an intra-agency memorandum one that has been received by an agency, to assist in the performance of its own functions, from a person acting in a governmentally conferred capacity other than on behalf of another agency – *e.g.*, in a capacity as employee or consultant to the agency, or as an employee or officer of another governmental unit (not an agency) that is authorized or required to provide advice to the agency.[9]

The Supreme Court noted that under this more expansive approach to Exemption 5,

---

[9]     *Klamath*, 532 U.S. at 9-10 (citing *United States Dept. of Justice v. Julian*, 485 U.S. 1, 18 n.1 (1988)(Scalia, J.,dissenting)).

courts "have held that the exemption extends to communications between Government agencies and outside consultants hired by them. . . . In such cases, the records submitted by outside consultants played essentially the same part in an agency's process of deliberation as documents prepared by the agency's personnel may have done." *Klamath*, 532 U.S. at 10 (internal citations omitted).  The consultant of the agency in such is situation "does not represent an interest of its own, or the interest of any other client, when it advises the agency that hires it.  Its only obligations are to truth and its sense of what good judgment calls for, and in those respects the consultant functions just as an employee would be expected to do."  *Id*. at 11.

As an initial matter, therefore, this Court must determine whether the documents sought by Plaintiffs are "inter-agency or intra-agency communications" under Exemption 5.  The uncontroverted evidence presented by the parties demonstrates that each of the four documents sought would constitute "inter-agency or intra-agency communications" as described by the Supreme Court in *Klamath*.    The Jones memorandum, a memo from Frank Jones, Bureau of Indian Affairs, to file, is a communication from an agency employee to the agency file.  Vaughn Index at 2.  The Jones memorandum thus constitutes an "intra-agency communication" and falls meets the first criterion of Exemption 5.  Similarly, the Welch letter, a  letter from Barry W. Welch, Assistant Area Director, Bureau of Indian Affairs, to John P. Lange, U.S. Department of Justice, constitutes an "inter-agency" communication.  Vaughn Index at 4.

The Bliesner letter and the Keller-Bliesner Report also constitute "inter-agency or intra-agency communications" pursuant to the consultant corollary of Exemption 5.  The Bliesner letter, from Ron D. Bliesner, Vice President, Keller-Bliesner Engineering to Frank Jones, Bureau of Indian Affairs, and the Keller-Bliesner Report were both prepared while Keller-Bliesner

Engineering acted as consultants to Defendant BIA.   Vaughn Index at 6 and 8; Def. Brief

Statement of the Case at 5; Cone Memo. at 6.  The Bliesner letter does not advocate the position

or interests of Keller-Bliesner Engineering, but rather discusses "a range of options on dealing

with the claims from the Animas, La Plata, and Dolores Rivers for the Southern Ute and Ute

Mountain Ute Tribes," and "includes a description of each option, the justification for each

option, and an analysis of the relative merits of each." Vaughn Index at 6.  Plaintiffs have not

argued that Ron Bliesner or Keller-Bliesner Engineering were not consultants of the BIA; Cone

noted that all four of the documents sought were created "either by or at the direction of

Defendants BIA and DOI as part of the government's preparation for litigation in the Colorado

stream adjudication."  Cone Memo. at 6.  Plaintiffs, in fact, characterized the report as an

evaluation by an "outside contractor" (Pl. Response at 14).  The Bliesner letter and Keller-

Bliesner Report, produced by Keller-Bliesner Engineering, a consultant to Defendant BIA, are

analogous to the type of work an employee of the agency would do.   These two communications

fall within the ambit of the consultant corollary discussed by the Supreme Court in *Klamath*, and

meet the first criterion of Exemption 5.   *Klamath*, 532 U.S. at 11.

Plaintiffs argue that the outcome in *Klamath* controls the outcome in the instant case,

mandating disclosure.  This case, however, may be factually distinguished from the situation

presented in *Klamath*.  The decision of the Supreme Court in *Klamath* rested on whether the first

criterion of Exemption 5, "inter-agency or intra-agency communications," was met.   The

communications sought pursuant to the *Klamath* plaintiffs FOIA request were communications

from the Tribe to the BIA and DOI, and a communication from the BIA to the tribe.[10]   *Klamath*

532 U.S. at 6.   The BIA and DOI had urged the Supreme Court to expand the consultant

corollary to Exemption 5 to protect from disclosure the Tribe's communications to the BIA "in its

capacity of fiduciary for the benefit of the Indian Tribes."  *Klamath*, 532 U.S. at 11.  The

Supreme Court, however, declined to expand the consultant corollary by analogy to include

communications made within the agency's fiduciary duty for the benefit of the Tribes.  *Klamath*

532 U.S. at 12.

   In determining whether the first criterion of Exemption 5 is met, this Court need not

expand the consultant corollary to find that the communications sought are "inter-agency or intra-

agency communication," nor must this Court consider the agency's fiduciary duty for the benefit

of the Tribe, the foundation of the Plaintiffs arguments in *Klamath*.   The Jones memorandum and

the Welch letter are clearly inter-agency or intra-agency communications.  The Bliesner letter and

the Keller-Bliesner Report are communications between a consultant and an agency.

Nevertheless, pursuant to the consultant corollary, the Bliesner letter and the Keller-Bliesner

Report fall within the ambit of "inter-agency or intra-agency communications."   Having so found,

I must now determine whether any of the privileges incorporated by Exemption 5 shields any of

these documents from production.

---

[10]      Because the Supreme Court concluded that the documents sought were not "inter-agency or intra-agency communications," the Court noted that "we need not reach step two of the Exemption 5 analysis and enquire whether the communications would normally be discoverable in civil litigation."  *Klamath* 532 U.S. at 12 n.3 (citing *United States v. Weber Aircraft Corp*. 465 U.S. 792, 799 (1984)).

2.     **Whether the withheld material would be "normally privileged in the civil discovery context"?**

The second prong of Exemption 5 deals with civil discovery privileges incorporated by Exemption 5.  *See* 5 U.S.C. § 552(b)(5).  Having examined whether the documents sought constitute "inter-agency or intra-agency communications," this Court must determine whether the documents sought would be "normally privileged in the civil discovery context."  *Sears, Roebuck*, 421 U.S. at 149.  The relevant inquiry is thus "whether the documents would be 'routinely' or 'normally' disclosed upon a showing of relevance" in civil discovery.  *Federal Trade Comm'n v. Grolier, Inc.*, 462 U.S. 19, 26 (1983).

The civil discovery privileges incorporated by Exemption 5:

> include the privilege for attorney work-product and what is sometimes called the 'deliberative process' privilege. Work product protects mental processes of the attorney, while deliberative process covers documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated. The deliberative process privilege rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news, and its object is to enhance the quality of agency decisions by protecting open and frank discussion among those who make them within the Government.

*Klamath*, 532 U.S. at 8-9 (internal citations omitted).  In determining whether the four documents sought are protected from disclosure pursuant to Exemption 5 of FOIA, an examination of the different types of privilege claimed is useful.

A.     **Deliberative Process Privilege**

One class of documents shielded from disclosure by Exemption 5 includes "agency reports and working papers subject to the 'executive' privilege for predecisional deliberations." *Cassad v. United States Dep't of Health Human Serv.*, 301 F.3d 1247, ___ , 2002 U.S. App. LEXIS 17899

*8 (10th Cir. August 29, 2002) (citing *Fed. Open Mkt. Comm. of Fed. Reserve Sys. v. Merrill*, 443 U.S. 340, 353 (1979)).   Deliberative process privilege ("DP") includes within its ambit "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Klamath*, 532 U.S. at 8 (citing *NLRB v. Sears, Roebuck &Co.,* 421 U.S. 132, 150 (1975)). The "deliberative process privilege 'rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news, and its object is to enhance the quality of agency decisions by protecting open and frank discussion among those who make them within the Government.'" *Cassad*,  301 F.3d at ___, 2002 U.S. App. LEXIS 17899 *8-9 (citing *Klamath*, 532 U.S. at 8-9).  "[T]he ultimate purpose of this long-recognized privilege is to prevent injury to the quality of agency decisions. The quality of a particular agency decision will clearly be affected by the communications received by the decisionmaker on the subject of the decision prior to the time the decision is made." *Sears, Roebuck,*  421 U.S. at 151.

### B.    Attorney-Client Privilege

The attorney-client privilege ("AC") is a civil discovery privilege which has been incorporated into Exemption 5. *Sears, Roebuck,* 421 U.S. at 149.  The attorney client privilege is one of the oldest recognized privileges for confidential communications. *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981).  The purpose of the AC privilege "is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice. The privilege recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client." *Upjohn*, 449 U.S. at 389.  The Supreme

Court in *Upjohn* noted that communications made between a company's attorney and various employees which were considered "highly confidential" when made, and which were kept confidential by the company were within the ambit of attorney-client privilege, and were thus not subject to compelled disclosure. *Id*. at 395.

### C.    Attorney Work-Product and Settlement Negotiation Privileges

The attorney's work-product immunity is a basic rule in the litigation context. *Fed. Trade Comm'n v. Grolier*, 462 U.S. 19, 24 (1983). "Congress had the attorney's work-product privilege specifically in mind when it adopted Exemption 5." *Sears, Roebuck*, 421 U.S. at 154. The attorney work-product privilege ("WP") is based on the recognition that "it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel." *Hickman v. Taylor*, 329 U.S. 495, 510-11 (1947). As such, "the work-product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case." *United States v. Nobles*, 422 U.S. 225, 238 (1975). WP privilege includes not only the product of the attorney, but also of agents for the attorney. *Id*. at 238-39. WP includes those documents "prepared in anticipation of litigation or trial" by or for the party or its representatives. FED. R. CIV. P. 26(b)(3). In *Grolier*, the Supreme Court observed that "Rule 26(b)(3) does not in so many words address the temporal scope of the work-product immunity, and a review of the Advisory Committee's comments reveals no express concern for that issue. But the literal language of the Rule protects materials prepared for any litigation or trial as long as they were prepared by or for a party to the subsequent litigation." *Grolier*, 462 U.S. at 25 (citing Notes of Advisory Committee on 1970 Amendments, 28 U. S. C. App., pp. 441-442). The *Grolier* Court therefore noted that "under

Exemption 5, attorney work product is exempt from mandatory disclosure without regard to the status of the litigation for which it was prepared." *Grolier*, 462 U.S. at 28.

Defendant claims that the Keller-Bliesner Report is also confidential pursuant to a "settlement negotiation privilege."  Def. Memo. at 19.  Defendant has cited no controlling Tenth Circuit law.  Various courts have both accepted and rejected the proposition that documents prepared for settlement negotiations are privileged.  *See*, *e.g.*, *County of Madison v. United States Dep't of Justice*, 641 F.2d 1036, 1041 (1ˢᵗ Cir. 1981)(wherein the First Circuit declined "the government's invitation to create a broadranging 'settlement exemption'" to FOIA, pursuant to Exemption 5);  *Scott Paper Co. v. Ceilcote Co.*, 591, 596 (D. Me. 1984)(finding that documents prepared for settlement were not work-product and were not privileged);

### D.   Government Commercial Information Privilege

The government commercial information privilege finds it basis in FED. R. CIV. P. 26(c)(7), which provides "that a trade secret or other confidential research, development or commercial information not be revealed or be revealed only in a designated way."   The Supreme Court has noted that:

> The federal courts have long recognized a qualified evidentiary privilege for trade secrets and other confidential commercial information. The Federal Rules of Civil Procedure provide similar qualified protection for trade secrets and confidential commercial information in the civil discovery context. Federal Rule Civ. Proc. 26 (c)(7) . . .  was intended in this respect to reflect existing law.  The Federal Rules, of course, are fully applicable to the United States as a party. . And  we see no reason why the Government could not, in an appropriate case, obtain a protective order under Rule 26 (c)(7).

*Federal Open Market Committee of Federal Reserve System v. Merrill,* 443 U.S. 340, 356-57 (1979)(internal citations omitted).  In making this observation, the Supreme Court further noted that the "House and Senate Reports do not provide the same unequivocal support for an Exemption 5 privilege for 'confidential . . .  commercial information' as they do for the executive and attorney work product privileges. Nevertheless, we think that the House Report, when read in

conjunction with the hearings conducted by the relevant House and Senate Committees, can fairly be read as authorizing at least a limited form of Exemption 5 protection for confidential . . . commercial information.'" *Id*. at 357. As such, although the GCI privilege has its basis in FED. R. CIV. P. 26(c)(7), it is not clear the extent to which the GCI privilege has been incorporated into Exemption 5 of FOIA.

### E. Release of segregable portions of documents.

FOIA further provides that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt" from disclosure pursuant to one of FOIA's enumerated exceptions. 5 U.S.C. § 552(b). The Court may conduct an *in camera* review of the materials sought, to determine " whether such records or any part thereof shall be withheld." *Department of Air Force v. Rose*, 425 U.S. 352, 374 (1976) (citing 5 U.S.C. § 552(b)). As such, in addition to determining whether any of the claimed privileges apply to the documents sought, the Court must determine whether any "reasonably segregable portions" may be provided to Plaintiffs after deletion of any portions which are exempt from disclosure.

Pursuant to the Order Requiring *In Camera* Review filed October 16, 2002 *(Doc. 74)*, Defendants submitted the documents at issue for *in camera* review by the Court[11]. After *in camera* review of the documents, I find that the Vaughn Index accurately describes the documents at issue. In addition, I find that all segregable portions of the documents have been released, as discussed below.

### F. Application of privileges to documents sought.

Having set forth the various privileges claimed, and having determined that there is no genuine issue of material fact that the documents sought constitute "inter-agency or intra-agency

---

[11]     5 U.S.C. § 552 (a)(4)(b) specifically provides that the Court "may examine the contents of such agency records in camera to determine whether such records or any part thereof shall be withheld. . . ."

communications" pursuant to the first prong of Exemption 5, I must determine whether there is any genuine issue of material fact as to the application of a civil discovery privilege to the documents at issue. *See* 5 U.S.C. § 552(b)(5); *Klamath*, 532 U.S. at 8.

**Jones Memorandum.** A review of the summary of the Jones memorandum indicates that the withheld portion of this document "largely related ideas and suggestions made by members of the litigation team . . . It is filled with deliberative and predecisional language. . . ." Vaughn Index at 2. Defendants argue that "the unreleased portions of this memorandum are predecisional and deliberative. They record the deliberations of the federal litigation team, and those deliberations were and are part of a continuing process of evaluating the best approach to the litigation." Vaughn Index at 3. The Defendants have previously released a portion of the Jones memorandum which indicates the attendees of the meeting held in the Albuquerque Area Office of the BIA regarding the State of Colorado Water Division No. 7 adjudication. *Id*. The discussions at the meeting were confidential. Second Cawley Decl. ¶ 13. The Jones memorandum, while including "suggestions for next steps in the litigation process," did not "record any final litigation decisions." *Id*.

The Jones memorandum, as described in the Vaughn Index and in the Second Cawley Declaration, and pursuant to the Court's *in camera* review, falls within the ambit of deliberative process privilege and work-product privilege in its entirety. The Jones memorandum memorializes the type of predecisional deliberations, "reflecting advisory opinions, recommendations and deliberations comprising party of [the] process by which governmental decisions and policies are formulated." *Klamath*, 532 U.S. at 8 (citing *Sears, Roebuck*, 421 U.S. at 150); *see also Cassad*, 301 F.3d at ___, 2002 U.S. App. LEXIS 17899 *8 (internal citation omitted). My *in camera* review of the Jones memorandum indicates that the document is replete with predecisional and deliberative language. The Jones memorandum describes possibilities, strategies, and predecisional concerns, particularly in light of the Colorado No. 7 adjudication. The Jones memorandum, prepared in anticipation of any further litigation in the Colorado No. 7

adjudication, by or for the party or its representatives, also reflects the mental processes of the attorney. *See, e.g., Sears, Roebuck,* 421 U.S. at 154;  *Hickman*, 329 U.S. at 510-11; *Nobles*, 422 U.S. at 238; FED. R. CIV. P. 26(b)(3).   The Jones memorandum explores various legal strategies. The *in camera*  review of the Jones memorandum demonstrates that this document falls within the ambit of WP privilege, as provided for in FED. R. CIV. P. 26(b)(3).[12]  The Defendants have released a portion of the Jones memorandum, which describes the meeting participants and date. The Court's *in camera* review of the this memorandum makes clear that Defendants have released all segregable portions of the document which are not privileged.

**Welch Letter.**         The Welch letter, a letter from an agency employee to the lead attorney for the Department of Justice for the litigation and negotiation of the Tribes' water rights, as described in the Vaughn Index and the Second Cawley Declaration, falls within the deliberative process, attorney-client, and attorney work product privileges.   The letter is described as "outlin[ing] some of the possible choices and their probable results" for making claims the Colorado No. 7 adjudication.  Vaughn Index at 4; Second Cawley Decl. ¶14.  The letter includes "practical and tactical considerations" such as "legal and political items to consider."  *Id*.  The *in camera* review of this document demonstrates that the Welch letter memorializes predecisional options, include legal options and considerations.   Predecisional language, relating to legal options, characterizes the entire letter.  The Welch letter thus constitutes the type of predecisional

---

[12]         Although the Jones memorandum describes the discussions at a meeting which occurred *after* the Colorado No. 7 adjudication commenced, I note that the adjudication has been a continuing process involving settlement, legislation, further negotiations and court decrees.  *See* Second Cawley Decl. ¶4.   For an in-depth description of the procedural history of the Colorado No. 7 adjudication, *see* Southern Ute Indian Tribe's Memo. at 8-10.

In any case, as the Supreme Court noted in *Grolier*, "Rule 26(b)(3) does not in so many words address the temporal scope of the work-product immunity. . . . But the literal language of the Rule protects materials prepared for *any* litigation or trial." *Grolier*, 462 U.S. at 25 (emphasis supplied)(internal citation omitted).  As such, pursuant to Exemption 5 of FOIA "attorney work product is exempt from mandatory disclosure without regard to the status of the litigation for which it was prepared." *Grolier*, 462 U.S. at 28.

and deliberative document which may be privileged. *Klamath*, 532 U.S. at 8 (citing *Sears, Roebuck*, 421 U.S. at 150); *see also Cassad*, 301 F.3d at ___, 2002 U.S. App. LEXIS 17899 *8 (internal citation omitted). The Welch letter is also a communication between attorney (Mr. John P. Lange, U.S. Department of Justice) and client (the BIA); this type of communication is privileged "to encourage full and frank communication between attorneys and their clients ." *Upjohn*, 449 U.S. at 389. In addition, as a document prepared in anticipation of litigation, which contains the mental processes of an agent for the attorney (in this case, the agency employee),the Welch letter is protected work-product, and is therefore subject to WP privilege. *See, e.g., Sears, Roebuck,* 421 U.S. at 154; *Hickman*, 329 U.S. at 510-11; *Nobles*, 422 U.S. at 238; FED. R. CIV. P. 26(b)(3). The *in camera* review of the Welch letter indicates that no segregable portions (i.e., portions which are not within the DP, AC, or WP privileges) are evident. There is no genuine issue of material fact as to whether the Welch letter is protected by a civil discovery privilege.

**Bliesner Letter.** The Bliesner letter, which was attached to the Welch letter, was prepared by Ron D. Bliesner, Vice President of Keller-Bliesner Engineering, a consultant of Defendant BIA. This letter is also protected from disclosure under both the deliberative process and attorney work product privileges. The Bliesner letter discussed "a range of options" for dealing with claims in the Colorado No. 7 adjudication, describes these options and their justification, and includes "an analysis of the relative merits of each." Vaughn Index at 6. The Bliesner letter is described as advising that "[w]e need to review these possibilities and weigh the options" and "reflects the legal advice" provided by Defendants attorney. Vaughn Index at 6; Second Cawley Decl. ¶15. The letter thus includes the type of predecisional and deliberative information which is protected by the deliberative process privilege. *Cassad*, 301 F.3d at ___, 2002 U.S. App. LEXIS 17899 *8. The *in camera* review of the Bliesner letter indicates that the document is predecisional, and includes information on possible courses of action, including the legal ramifications of each option discussed. The letter also constitutes work product as a document "prepared in anticipation of litigation or trial" by or for the party or its representatives.

26

FED. R. CIV. P. 26(b)(3).  The *in camera* review of the Bliesner letter indicates that no segregable portions are evident.  There is no genuine issue of material fact as to whether the Bliesner letter is protected from disclosure by a civil discovery privilege, nor is there a genuine issue of material fact as to whether segregable portions exist.

**Keller-Bliesner Report.**        The final document at issue is the Keller-Bliesner Report, a "Preliminary Assessment:  Reserved Irrigation Water Right Claims, Southern Ute Reservation," prepared by Keller-Bliesner Engineering, a consult of Defendant BIA.[13]  Vaughn Index at 9.  A portion of the introduction to the Keller-Bliesner Report was released, and describes the contents of this document as "a preliminary description of the potential areas for irrigation  project development ."  *Id*.  The Keller-Bliesner report includes the type of predecisional deliberations which are protected by the deliberative process privilege.    *Cassad*, 301 F.3d at ___, 2002 U.S. App. LEXIS 17899 *8.  *In camera* review of the Keller-Bliesner report indicates that the report includes a description of various possible irrigation project areas, with each description relating to options of the BIA, particularly in regards to the Colorado No. 7 adjudication.   The introduction also notes that "[t]he information provided herein is intended for use by the BIA and the Tribe in preparing a negotiating position for water rights."   Vaughn Index at 9.  The Keller-Bliesner Report was "ultimately intended for use by the attorneys for litigation purposes, including seeking a negotiated settlement and Consent Decree," and was "created exclusively or the purposes of the Colorado [No.7] adjudication."   Second Cawley Decl. ¶¶19-20.  The contract providing for the Keller-Bliesner Report specifically required its confidentiality.  Second Cawley Decl. ¶18.  The Keller-Bliesner Report thus constitutes work product, and is shielded from discovery, as a document "prepared in anticipation of litigation or trial" by or for the party or its representatives. FED. R. CIV. P. 26(b)(3).  The Keller-Bliesner Report was prepared by a consultant of the BIA, to

---

[13]        The Keller-Bliesner Report was sought by both Plaintiffs Cone and CPA. Defendants denied both FOIA requests for the Keller-Bliesner Report on the same basis.  As such, the same reasoning applies in the Court's analysis of the denial of both requests.

be used by attorneys for BIA in anticipation of the Colorado No. 7 adjudication and related settlement negotiations.  Although portions of the Keller-Bliesner Report were released, the *in camera* review of the report indicates that the withheld portions are subject to privilege and that no segregable portions are evident.  There is no genuine issue of material fact as to whether the Keller-Bliesner Report is protected by a civil discovery privilege.[14][15]

     **3.**     **Whether the subsequent disclosure of the documents to the Southern Ute Tribe's attorney waived all of the applicable privileges for each document?**

Plaintiffs have argued that any privilege which may have protected the Welch letter, the Bliesner letter, and the Keller-Bliesner Report at issue from disclosure was waived by the Defendants, when Department of Justice attorney in charge of the Colorado No. 7 adjudication disclosed these letters and the Keller-Bliesner Report under separate cover to the attorney for Intervenors Southern Ute Indian Tribe.  Defendants in turn claim that no waiver occurred, pursuant to the "common-interest privilege."

---

[14]     While Defendants have claimed that the Keller-Bliesner Report is also subject to the "government confidential information" privilege, this Court need not address this issue, having found the Report is within the deliberative process and work product privilege.  Although the Supreme Court has noted that the legislative history of Exemption 5 does not "provide the same unequivocal support for an Exemption 5 privilege for 'confidential . . . commercial information' as they do for the executive and attorney work product privileges," the Court additionally noted that there may be "at least a limited form of Exemption 5 protection for confidential . . . commercial information.'" *Federal Open Market Committee,* 443 U.S. at 357(internal citations omitted).  Defendants have produced no authority to suggest that the extent to which any form of government confidential information may be recognized in the Tenth Circuit, in the context of Exemption 5 of FOIA.

[15]     Defendants have also claimed that the Keller-Bliesner Report is subject to a "settlement negotiations privilege."  As noted above, the courts which have addressed the issue of the existence of a settlement negotiations privilege have reached differing conclusions.  *See, e.g.*, *County of Madison v. United States Dep't of Justice*, 641 F.2d 1036, 1041 (1st Cir. 1981)(wherein the First Circuit declined "the government's invitation to create a broadranging 'settlement exemption'" to FOIA, pursuant to Exemption 5).  As I have already determined that the Keller-Bliesner Report is subject to the work product and deliberative process privileges, I need not determine whether the Tenth Circuit would follow those courts which have rejected or recognized such a privilege.  However, I note that the "settlement negotiations privilege," like the "government confidential information privilege" does not appear to have the same grounding in legislative history of Exemption 5 as the attorney-client or work product privileges.

The common interest privilege, basically a claimed exception to waiver has been described thusly:

> The common interest privilege is not an independent basis for privilege, but is an exception to the general rule that the attorney-client privilege is waived when privileged information is disclosed to a third party.  As such, the common defense privilege assumes the existence of a valid underlying privilege.  It also assumes that there is a valid basis for exchanging information with a third party without undermining the requirement of confidentiality for the attorney-client privilege to apply.

EDNA SELAN EPSTEIN, THE ATTORNEY-CLIENT PRIVILEGE AND THE WORK-PRODUCT DOCTRINE (4th ed. 2001) at 196.  The common interest privilege has also been called the "allied lawyer" privilege.  *Id*.  Allied lawyers may be involved in a common defense or in pursuant of a common client interest.  24 CHARLES A. WRIGHT & KENNETH A. GRAHAM, JR., FEDERAL PRACTICE & PROCEDURE § 5493 (1997).

Section 76(1) of the RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS (2000) describes the privilege in common-interest arrangements as applying:

> [i]f two or more clients with a common interest in a litigated or nonlitigated matter are represented by separate lawyers and they agree to exchange information concerning the matter, a communication of any such client that otherwise qualifies as privileged under §§ 68-72 that relates to the matter is privileged as against third persons. Any such client may invoke the privilege, unless it has been waived by the client who made the communication.

RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS, § 76 (2000). The common interest doctrine "normally operates as a shield to preclude waiver of the attorney-client privilege when a disclosure of confidential information is made to a third party who shares a community of interest with the represented party." *Frontier Ref. v. Gorman-Rupp Co.*, 136 F.3d 695, 705 (10th Cir. 1998).  The common interest doctrine "enables counsel for clients facing a common litigation opponent to exchange privileged communications and attorney work product in order to adequately prepare a defense without waiving either privilege." *Western Fuels Ass'n, Inc. v. Burlington N. R.R. Co.,* 102 F.R.D. 201, 203 (D. Wyo. 1984)(internal citations omitted).

Defendant BIA stated that it "learned subsequent to the initiation of this litigation that the

Department of Justice attorney in charge of the Colorado adjudication had disclosed under separate cover both [the Welch and Bliesner] Letters and the [Keller-Bliesner] Preliminary Assessment to the Southern Ute Tribe's attorney."  Second Cawley Decl. ¶ 24.  The BIA further noted that "when the two Letters and the Preliminary Assessment were sent to the Department of Justice, the BIA intended to do so confidentially with the understanding that the communications would be protected by the attorney-client privilege."  Second Cawley Decl. ¶ 21.  The BIA states that "[n]one of the documents have been circulated within the agency as a whole, they have been disclosed only to those within the Department that are officially interested in the litigation." Second Cawley Decl. ¶22.   The cover letter disclosing the Keller-Bliesner Report stated that "[t]he assessment is preliminary and confidential" and directed the Tribe's attorney to maintain its confidentiality.  Second Cawley Decl. ¶25; Southern Ute Memo Ex. 2.  Defendant notes that "[t]he United States frequently has filed joint briefs with Indian tribes when litigating tribal water rights."  *Id*. at ¶28.

       Although Plaintiffs claim that the Defendants may have further disclosed the documents at issue, Plaintiffs have come forward with no facts to support this argument.   The uncontroverted evidence provided suggests that although the Welch letter, the Bliesner letter, and the Keller-Bliesner Report were shared with the attorney for the Southern Ute Indian Tribe, such disclosure was done so confidentially, with an expectation that the confidentiality of the documents would be maintained.  In addition, it is appears that the Defendants and the Southern Ute Indian Tribe shared common interests in the underlying Colorado No. 7 adjudication. In 1985, at the time that the Keller-Bliesner Report was made, the Southern Ute Indian Tribe was being represented by the United States Department of Justice as well as the Native American Rights Fund in Boulder Colorado.  Southern Ute Memo. Ex. 6.  In addition, the Southern Ute Indian Tribe and the United States filed a Joint Request for Amendments of Consents in the Colorado No. 7 adjudication. Southern Ute Memo. Ex. 11.  The confidential disclosure of the Welch letter, the Bliesner letter, and the Keller-Bliesner Report appears to be the type of  "disclosure of confidential information

[that] is made to a third party who shares a community of interest with the represented party"
protected by the common-interest privilege. *See Frontier Ref.*, 136 F.3d at 705. Plaintiffs have
provided no evidence to contravene that provided by Defendants. As such, there is no genuine
issue of material fact as to whether the disclosure of the Welch letter, the Bliesner letter, and the
Keller-Bliesner Report were protected under the common-interest privilege, no waiver thereof
having been shown.

**B.     Whether Defendant BIA Erred in Failing to Search for Records Responsive to Plaintiff CPA's FOIA Request**

As the Tenth Circuit has noted, "'the Freedom of Information Act imposes no independent
obligation on agencies to write opinions. It simply requires them to disclose the opinions which
they do write . . . If the public interest suffers from an agency's failure to explain, then "the
remedy is for Congress to require it to do so.'" *Cassad*, 301 F.3d at ___, 2002 U.S. App.
LEXIS 17899, *13 (quoting *Renegotiation Board v Grumman Aircraft Eng'g Corp.*, 421 U.S.
168, 192 (1975)). FOIA "does not compel agencies to write opinions in cases in which they
would not otherwise be required to do so. It only requires disclosure of certain documents which
the law requires the agency to prepare or which the agency has decided for its own reasons to
create." *Sears, Roebuck,* 421 U.S. at 161-62 (citing *Sterling Drug, Inc. v. FTC*, 146 U.S. App.
D.C. 237, 450 F. 2d 698 (1971)). The agency is thus not required to furnish explanatory material
under FOIA. *Id*. at 162.

This Court has examined Plaintiff CPA's FOIA request. *See* CPA Memo. Ex. A. The
request includes a request for explanation, quantification, or organization of most of the
documents request. Paragraph (a) requests various laws and regulations "that guide your agency
in the establishment of use or carriage rates for Indian and non-Indian use of federally constructed
conveyance systems in the Pine River drainage." *Id*. This paragraph further states "we would like
some *explanation* of how those differences were derived and justified. [A] listing of all individual
Pine River Contracts  with corresponding carriage rates is hereby requested. *A delineation by Ute*

*and non-Ute contractors* is also requested.  *Id* (emphasis supplied).  Paragraph (c) requests "[a]

*complete breakdown* of how Ute tribal water . . . is being used, . . . *whether the irrigation*

*enterprise(s) are Indian or non-Indian and or managed with details as to acreage appropriate to*

*each condition and the estimated annual net revenue to the Tribe.*"  *Id* (emphasis supplied).

Paragraph (c) further requests "*a breakdown* of how the Indian direct-flow rights . . . are being

used by tribal allottees, *the number* of allottee acres being irrigation, *the present disposition* of

said acreage, *whether Ute or non-Ute owned and/or operated with details as to category, and an*

*estimate of net income derived by tribal allottees."  Id* (emphasis supplied).  Paragraph (d), a

request for BIA budget information, requests that the information provided "*be detailed enough*

to allow a reckoning of how federal tax dollars were allocated."  Paragraph (d) further requests

"an *accounting* of how much of the annual expenditures were recovered to the Treasury and how

much were not" and "an *accounting* of any and all revenues accruing to the agency."  *Id*

(emphasis supplied).

   All of the language which the Court has quoted and emphasized above appears to request

not only information, but information which Plaintiff CPA wants explained, quantified, or

organized in specific ways.  Defendants may be required to disclose material pursuant to FOIA,

but Defendants are not required to either create new records or explain any records produced.

*Sears, Roebuck,* 421 U.S. at 161-62

   Plaintiff CPA argues that the Defendants improperly failed to advise CPA of the ways in

which CPA needed to clarify its FOIA request.  However, pursuant to 42 C.F.R. § 2.16(c)(2),

"[a] decision denying a request for failure to described requested records . . . shall be in writing

and shall include a description of the basis for the decision, a list of the names and titles of each

person responsible, and a statement that the matter may be appealed."  42 C.F.R. §2.16(c)(2)(i)-

(ii). Defendant's September 17, 1999 response letter meets each of these criteria.  *See* CPA

Memo. Ex. B.  Plaintiff CPA has come forward with no evidence to demonstrate that the

Defendant's response letter did not meet the requirements of 42 C.F.R. §2.16(c)(2).   As such,

there is no genuine issue of material fact as to whether Defendant BIA erred in failing to search for records responsive to Plaintiff CPA's FOIA request.  Defendant is thus entitled summary judgment against Plaintiff CPA on this issue.

**C.    Whether Defendant BIA Erred in Failing to Grant Plaintiff CPA's Fee Waiver Request**

Plaintiff CPA claims that the BIA erred in failing to grant CPA's fee waiver request, made with its August 10, 1999 FOIA request.  In its letter, CPA provided information in support of its fee waiver request, stating that CPA is a non-profit organization, describing CPA's activities, and describing what CPA planned to do with the information it sought in its FOIA request.  CPA Memo. Ex. A.  In its September 17, 1999 response letter, Defendant BIA asked for clarification of the FOIA request, stating that "[w]hen you provide further clarification regarding your extremely lengthy FOIA request for the remainder of the documents, your request, as well as fee-waiver demand, will be reviewed and responded to."  CPA Memo. Ex. B.  While Plaintiff CPA, in its appeal to the FOIA Appeals Officer characterized Defendant's lack of action on its fee waiver request as arbitrarily and capriciously "ignoring the request for fee waiver, without any basis in law," the BIA's response only deferred consideration of the fee waiver until CPA clarified its FOIA request.  CPA Memo. Ex. C and B.  CPA never submitted a supplemental or clarifying FOIA request; as such the BIA did not review or respond to the fee waiver request.  In its response letter, the BIA specifically noted that the response constituted only a partial denial, and did not address CPA's fee waiver request.  CPA Memo. Ex. B.  The  FOIA Appeals Officer treated the deferment of the fee waiver as a denial, and upheld the denial stating that CPA had failed to explain "how it will use the requested information to increase the general public's understanding of the operations and activities of the government."  CPA Memo. Ex. D. However, if CPA had clarified its FOIA request, Defendant may have (1) granted the fee waiver, (2) denied the fee waiver, or (3) asked for further information in considering the fee waiver. Because CPA did not clarify its FOIA request, this Court may not predict what action Defendant

33

BIA may have taken on CPA's fee waiver request.

"In any action by a requester regarding the waiver of fees under this section, the court shall determine the matter de novo: Provided, That the court's review of the matter shall be limited to the record before the agency."  5 U.S.C. § 552(a)(4)(A)(vii).  CPA bears the burden of establishing its entitlement to a fee waiver. 43 C.F.R. 2.19.  The BIA "will waive fees (in whole or part) if disclosure of all or part of the information is in the public interest because its release -- (1) Is likely to contribute significantly to public understanding of the operations or activities of the Government; and  (2) Is not primarily in the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii).  In determining whether disclosure of records will contribute significantly to the public's understanding of the operation or activities of the government, it is relevant to consider the subject matter of the requests and the ability of the requester to disseminate the information. *Carney v. United States Dep't of Justice*, 19 F.3d 807, 814 (2nd Cir. 1984).  Moreover, the BIA is entitled to ask for more information with regards to a fee waiver request, where the information provided is not sufficient.  *See McClellan Ecological  Seepage Situation v. Carlucci*, 835 F.2d 1282, 12 87 (9th Cir. 1987)("The fee waiver statute nowhere suggests that an agency may not ask for more information if the requester fails to provide enough. Legislative history and agency regulations imply that an agency may seek additional information when establishing a requester's category for fee assessment.").  The Fifth Circuit addressed a factually similar situation in *Voinche v. United States Dep't of Air Force*, 983 F.2d 667, 669 (5th Cir. 1993).  In *Voinche*, the Fifth Circuit noted:

> [The agency] did not rule on Voinche's request for a fee waiver, but instead asked Voinche to be more specific in his second FOIA request, pursuant to Air  Force regulations. The Air Force stated that it would take no further action until Voinche did so. Instead of amending his second FOIA request, Voinche brought a judicial action against the Air Force. Because Voinche could have amended his second request, and could have sought a ruling on his fee waiver request after doing so, Voinche failed to exhaust his administrative remedies with regard to his second FOIA request.

*Voinche*, 983 F.2d at 669 n.5 (internal citations omitted).

34

In this case, CPA appealed the partial denial of its FOIA request.  CPA Memo. Ex. C. Although CPA's fee waiver request was never denied, the FOIA Appeals Officer treated the deferment as a denial, which the Appeals Officer affirmed.  CPA Memo. Ex. D.  However, an examination of the information provided by CPA indicates that there is no genuine issue of material fact that Defendant BIA erred by denying CPA's fee waiver request.

In reviewing CPA's request for a fee waiver,  the Court's review of the matter is limited to the record before the agency.  5 U.S.C. § 552(a)(4)(A)(vii). Because CPA did not supplement its FOIA request or its request for a fee waiver, my review is limited to CPA's initial request, CPA's notice of appeal to the FOIA Appeals Officer, and the decision of the FOIA Appeals Officer.  *See generally,*  CPA Memo. Ex. B, C, and D.  In its initial request, CPA stated that is a non-profit organization "which serves the public interest by in increasing the general public awareness of public land and water management issues."  CPA Memo. Ex. B.  CPA stated that obtaining the information sought in its FOIA request "will enable us to participate more effectively in the public decision-making process . . . and help up to education the public."  *Id*.  CPA stated that it opposes the certain legislation related to the Animas and La Plata rivers, and that it has filed conflict-of-interest charges against Senator Campbell.  *Id*.  CPA stated that the information in its FOIA request "is vital to the public interest in helping to resolve the conflict of interest charges" against Senator Campbell.  CPA Memo. Ex. B.  CPA further provided that it would make any information obtained "available to the public."  *Id*.   CPA stated that "[i]t has an excellent success record in acquiring in-depth, mainstream news coverage of public lands and water management issues."  *Id*.  In its notice of appeal, CPA provided no other factual information in support of its fee waiver request.  CPA Memo. Ex. C.

Neither party has argued that CPA's FOIA request is primarily in the commercial interest of the requester.  Therefore, the Court  must determine whether CPA's FOIA fee waiver is likely to contribute significantly to public understanding of the operations or activities of the Government.  5 U.S.C. § 552(a)(4)(A)(iii).   Although CPA has described its success in

"acquiring in-depth, mainstream news coverage of public lands and water management issues," intending to release information obtained pursuant to a FOIA request to the media is not sufficient to demonstrate that disclosure would contribute significantly to public understanding of the operations or activities of the government. *See, e.g., Larsen v. CIA*, 843 F.2d 1481, 1483 (D.C. Cir. 1988). The request must show not only "a connection between the material sought and a matter of genuine public concern, but must also indicate that a fee waiver or reduction will *primarily* benefit the public." *National Treasury Employees Union v. Griffin*, 811 F.2d 644, 648 (D.C. Cir. 1987)(emphasis supplied). Reviewing the record before the agency in the light most favorable to CPA, it is apparent that the information provided was not sufficient to support CPA's request for a fee waiver. Had CPA chosen to clarify its FOIA request, CPA would also have had the opportunity to have its fee waiver request reviewed, and perhaps had the opportunity to provide additional information in support of its fee waiver request.[16] Nevertheless, upon my review of the record before the agency, I find that there is no genuine issue of material fact and that Defendant BIA is entitled to summary judgment against Plaintiff CPA on the fee waiver issue.

## IV. CONCLUSION

THIS COURT having considered the Plaintiffs', Defendants' and Intervenors' cross-motions for summary judgment; the parties' various response and replies; the Memoranda, exhibits, and declarations in support of their positions, as well as the Vaughn Index, and the applicable law, and upon *in camera* review of the documents at issue, finds that Plaintiff Steve Cone's Motion for Summary Judgment is not well-taken, and should be **DENIED**; that Plaintiff CPA's Motion for Summary Judgment is not well-taken and should be **DENIED**; and that

---

[16] Pursuant to 43 C.F.R. § 2.19 (c), if the agency had denied CPA's fee waiver request, it would have been required to notify CPA in writing of the basis for the denial, including a full explanation of why its fee waiver request did not meet DOI's fee waiver criteria. As noted above, CPA appealed the partial denial of its FOIA request, including the deferment of decision of the fee waiver request. Although the BIA had thus not denied the fee waiver request, the FOIA Appeals Officer treated the deferment as a denial for the purposes of the appeal.

Defendants' and Intervenors' Motions for Summary Judgment are well-taken and should be **GRANTED**.

Wherefore,

**IT IS ORDERED** that Defendants' and Intervenors' Motions for Summary Judgment *(Doc. 37, 39, 45 and 53)* are **GRANTED**;

**IT IS FURTHER ORDERED** that Plaintiffs' Motions for Summary Judgment *(Docs. 41 and 43)* are **DENIED**.

A judgment consistent with this Order shall be issued forthwith.

**IT IS SO ORDERED**.

_____
**LESLIE C. SMITH**
**UNITED STATES MAGISTRATE JUDGE**